IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VICTORIA OSTERLAND, | ) | CASE NO. 3:18-cv-01211 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Victoria Osterland ("Plaintiff" or "Osterland") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

finding Osterland not disabled from December 1, 2010, through November 16, 2013.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the

undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 11. For the reasons

set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Osterland filed an application for Disability Insurance Benefits ("DIB") on December 7,

2011, and protectively filed[1] an application for Supplemental Security Income ("SSI") on May 1,

2012. Tr. 20. She alleged a disability onset date of December 1, 2010. Tr. 20. Osterland

alleged disability due to chest pain, clotting issues and lung problems. Tr. 83, 94, 124, 128.

Osterland's applications were denied initially (Tr. 124-126) and upon reconsideration by the

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 5/21/2019).

state agency (Tr. 128-129, 130-131). Thereafter, she requested an administrative hearing. Tr. 132. On January 22, 2014, Administrative Law Judge Melissa Warner ("ALJ" or "ALJ Warner") conducted a hearing (Tr. 43-72) and, on February 6, 2014, she issued a partially favorable decision, finding Osterland not disabled prior to November 17, 2013, but disabled beginning on November 17, 2013, through the date of the decision (Tr. 16-42).

Osterland requested review of the ALJ's decision by the Appeals Council. Tr. 14. On April 23, 2015, the Appeals Council denied Osterland's request for review, making the ALJ's February 6, 2014, decision the final decision of the Commissioner. Tr. 1-6. Osterland filed an appeal with the District Court for the Northern District of Ohio. Tr. 610. On August 11, 2016, this Court issued a Memorandum and Opinion and Judgment Entry in Case No. 3:15-cv-00990, vacating and remanding the final decision of the Commissioner (Tr. 608-631, 632), finding that "the ALJ violated the treating source rule and failed to set forth good reasons for rejecting the limitations assessed by Dr. Hoy." (Tr. 630). On October 11, 2016, the Appeals Council issued its order remanding the case to an administrative law judge for further proceedings pursuant to the decision rendered by this Court, Case No. 3:15-cv-00990. Tr. 633-637. In that order, the Appeals Council noted that the ALJ had found Osterland disabled beginning November 17, 2013, the date Osterland's age category changed. Tr. 635. Having reviewed that decision, the Appeals Council found that it was supported by substantial evidence and, therefore, affirmed that decision. Tr. 635. However, the Appeals Council indicated that the period prior to November 17, 2013, required further administrative proceedings and vacated the final decision of the Commissioner and remanded the case to an administrative law judge for further proceedings consistent with the court's order. Tr. 635. On remand, the Appeals Council ordered the

administrative law judge to offer Osterland an opportunity for a hearing and to take further action needed to complete the administrative record and issue a new decision. Tr. 636.

Pursuant to the remand order, on March 1, 2017, ALJ Warner conducted an administrative hearing. Tr. 551-573. On June 20, 2017, the ALJ issued an unfavorable decision, (Tr. 521-547), finding Osterland had not been under a disability as defined in the Social Security Act from December 1, 2010, through November 16, 2013 (Tr. 537). Osterland filed exceptions to the ALJ's June 20, 2017, decision with the Appeals Council. Tr. 514, 719-727. On April 24, 2018, the Appeals Council found Osterland's exceptions to be without merit and found no reason to assume jurisdiction. Tr. 514-520. Thus, the ALJ's June 20, 2017, became the final decision of the Commissioner. Tr. 515.

## II. Evidence

### A.    Personal, vocational and educational evidence

Osterland was born in 1959. Tr. 204. Osterland has a high school degree. Tr. 51, 375. She has three adult children. Tr. 375. Her past work included work as a greeter at Walmart, a part-time home health aide for Easter Seals, a direct care health care provider at the Flat Rock Children's Home, and a receptionist at Gaines Collision. Tr. 52-55. Osterland last worked at Walmart in October 2010. Tr. 56-57.

### B.    Medical evidence

#### 1.    Treatment records

Osterland was hospitalized at Fisher-Titus Medical Center from December 18, 2010, through December 27, 2010. Tr. 293-340. She complained of a 3-week history of chest cold symptoms, including a cough; chest pain; and shortness of breath. Tr. 293. Osterland also complained of chills and sweats without a fever and a decreased appetite. Tr. 293.

On admission, a physical examination showed that Osterland's lungs were clear to auscultation; her breath sounds were equal; and she had a mild, non-hacking, non-dry, and non-blood tinged cough. Tr. 294. During Osterland's admission, a CTA of the chest showed bilateral pulmonary emboli (Tr. 301, 320) and a chest x-ray showed that Osterland's lungs were hyperaerated; her heart was slightly enlarged; there were small calcified granulomas throughout both lungs; and there was a benign osteoma of the neck of the left humerus (Tr. 321). An echocardiogram was performed to further assess the pulmonary emboli and shortness of breath. Tr. 322. The echocardiogram showed the wall thickness of Osterland's left ventricle to be normal; left ventricular systolic function appeared normal; atrial sizes appeared normal; right ventricle was mildly dilated; "[m]itral valve with trace mitral regurgitation[;] [t]ricuspid valve with moderate range tricuspid regurgitation and evidence for a moderate increase in right ventricular systolic pressure[;]" and the aortic valve appeared unremarkable. Tr. 322. An ultrasound was performed of Osterland's lower extremity venous duplex bilaterally due to blood clot. Tr. 323. The ultrasound showed "No evidence of deep venous thrombosis of the right leg. Chronic post thrombotic scarring of the left leg." Tr. 323. Osterland was diagnosed with recurring deep venous thrombosis with a prior history in her legs and a pulmonary embolism. Tr. 301-302, 312. To address those issues, Oseterland underwent a right femoral vein catheterization, vena cava angiography, and vena caval Trapeze filter insertion (IVC filter). Tr. 302, 312-313. Osterland was advised to follow up with a hematologist "to work up hypercoagulable state." Tr. 302. When Osterland was discharged on December 27, 2010, her diagnoses included chest pain, shortness of breath, diabetes mellitus, weakness or fatigue, pulmonary embolism, and dyspnea. Tr. 299.

On December 30, 2010, Osterland saw her primary care physician, Dr. Doug M. Hoy, M.D., for follow up regarding her pulmonary embolism. Tr. 357-358. Osterland weighed 338.2 pounds, with a Body Mass Index (BMI) of 62.08. Tr. 357. On physical examination of Osterland's lungs, her lungs were clear with good air exchange; there was no wheeze, rales, or rhonchi; and she had a normal inspiratory and expiratory phase. Tr. 357. Dr. Hoy's physical examination also revealed a normal heart rate, a regular rhythm, and no murmurs or rubs. Tr. 357. Other examination findings were normal. Tr. 357. Dr. Hoy prescribed coumadin. Tr. 357. Dr. Hoy noted that Osterland's current and past medical problem list included: pulmonary embolism and history of pulmonary embolism, back pain, bronchitis (acute), family history of coronary artery disease, pneumonia, chest pain (heart catheterization normal), breast cyst (right), vertigo, urinary tract infection, total hysterectomy, foot pain (second digit – right foot with tenderness), cervical strain, and knee pain (right). Tr. 357-358.

Osterland saw Dr. Hoy on February 17, 2011, with complaints of chest pain. Tr. 362-363. She complained of having chest pain on and off since she was discharged from the hospital at the end of December. Tr. 362. Her chest pain had become more constant and was worse with deep breathing. Tr. 362. Osterland also relayed that her hands were going numb on occasion. Tr. 362. Osterland's weight had increased to 345.4 pounds. Tr. 362. On physical examination, Osterland's lungs were clear with good air exchange; there was no wheeze, rales, or rhonchi; and there was a normal inspiratory and expiratory phase. Tr. 362. Dr. Hoy's physical examination also revealed a normal heart rate, a regular rhythm, and no murmurs or rubs. Tr. 357. Dr. Hoy added metoprolol tartrate[2] to Osterland's medications. Tr. 363. Osterland was continued on coumadin. Tr. 363.

---

[2] Metoprolol tartrate is used to treat high blood pressure and is also used to treat chest pain. *See* https://www.webmd.com/drugs/2/drug-11207/metoprolol-tartrate-oral/details (last visited 5/21/2019).

On March 4, 2011, Osterland sought emergency room treatment at Fisher-Titus Medical Center with complaints of a cough, weakness, fatigue, vomiting and loss of appetite, diarrhea, and blood in stool. Tr. 345. Osterland had no fever, chills, chest pain or shortness of breath. Tr. 345. Cardiovascular, respiratory, chest wall, back and musculoskeletal physical examination findings were normal. Tr. 347-348. Emergency room diagnoses were rectal bleeding, weakness of muscles, vomiting, fatigue, and hypokalemia. Tr. 351. Osterland was admitted for further IV fluids. Tr. 351. A chest x-ray taken on March 4, 2011, was negative. Tr. 351, 356. Osterland was discharged on March 6, 2011. Tr. 347.

On March 7, 2011, Dr. Hoy prescribed a new coumadin dose. Tr. 364. On March 17, 2011, Osterland saw Dr. Hoy for follow up after her hospital visit. Tr. 366-367. Dr. Hoy noted that Osterland was anemic due to her rectal bleeding. Tr. 366. Examination findings of Osterland's heart and lungs were normal. Tr. 366. Dr. Hoy prescribed Cipro and made a change to the metoprolol tartrate. Tr. 367.

Osterland saw Dr. Hoy on December 12, 2011. Tr. 371-373. She complained of a cough, laryngitis, weakness, dizziness, leg cramps, and some clear sinus drainage. Tr. 371. Osterland weighed 354 pounds. Tr. 371. Physical examination findings were normal. Tr. 371. Dr. Hoy diagnosed sinusitis and prescribed medications. Tr. 372-373.

Osterland saw Dr. Hoy on February 23, 2012. Tr. 390-391. She requested that Dr. Hoy complete papers for social security disability. Tr. 390. She also complained of left-foot edema and hoarseness. Tr. 390. Osterland weighed 359.4 pounds. Tr. 390. Dr. Hoy's physical examination findings were generally normal except the lower extremity examination showed 1+ edema and tenderness. Tr. 390. Dr. Hoy adjusted Osterland's coumadin. Tr. 391.

Osterland was hospitalized at Fisher-Titus Medical Center from July 24, 2012, through July 27, 2012, (Tr. 419-441), with complaints of chest pain, numbness in left arm, headache, nausea, shortness of breath, and edema. Tr. 419. On physical examination, Osterland's breath sounds were equal but diminished bilaterally. Tr. 420. Her heart rate and rhythm were regular and there were no murmurs and she had normal peripheral perfusion. Tr. 420. Osterland's back was nontender and she had normal range of motion and alignment in her back. Tr. 420. Osterland had tenderness in her left lower extremity and swelling in her left ankle/foot with +1 pitting on her left foot. Tr. 421. Osterland's neurological examination showed normal coordination. Tr. 421. Osterland had no chest wall tenderness or deformity. Tr. 420. During her admission, Osterland was diagnosed with chest pain, pulmonary vascular congestion, subtherapeutic INR, cephalgia, dyspnea and respiratory abnormalities, morbid obesity and edema. Tr. 422, 430, 437. A chest x-ray showed cardiomegaly and prominence of the pulmonary vasculature with an area of hazy density at the right lower lobe which was noted to be a possible right pleural effusion – a new finding as compared to December 18, 2010. Tr. 439. Further follow up was recommended. Tr. 439. An echocardiogram showed no abnormalities. Tr. 431, 440. She was started on medications, including Lasix and beta-blockers for suspected coronary heart failure. Tr. 431. Beta-blockers were discontinued due to episodes of lightheadedness and dizziness with lower blood pressure. Tr. 431. Osterland's lower extremity edema improved with Lasix. Tr. 432.

Following her admission at Fisher-Titus Medical Center, Osterland saw Dr. Hoy for follow up on August 6, 2012. Tr. 449-451. During that visit, they also discussed Osterland's disability and she complained of pain in her right inner thigh that she had been having for a month and more swelling in her left leg. Tr. 449. Dr. Hoy noted that Osterland had been seen in

the emergency room for suspected coronary heart failure.  Tr. 449.  Osterland was better when she was sent home and had been watching her fluid intake and taking coumadin.  Tr. 449.  Osterland weighed 347.4 pounds.  Tr. 449.  On physical examination, Dr. Hoy observed normal lung and heart examination findings.  Tr. 449.  The lower extremity examination revealed some tenderness in Osterland's left leg.  Tr. 449.  Dr. Hoy added leg cramps as a new problem and added Coreg[3] to Osterland's medications.  Tr. 449-450.  Dr. Hoy also ordered a venous ultrasound.  Tr. 451.  The ultrasound showed no evidence of venous thrombosis involving visualized deep veins of the left leg.  Tr. 448.  A chest x-ray taken on August 31, 2012, showed no active chest disease.  Tr. 463.  There were no infiltrates or pleural effusions noted.  Tr. 463.  The radiology report noted that the findings from the prior July 24, 2012, exam had resolved.  Tr. 463.

On September 20, 2012, Dr. Hoy completed an order sheet for a diagnostic sleep study for obstructive sleep apnea.  Tr. 461.  Dr. Hoy noted the following symptoms as reasons the testing was a medical necessity – obesity, frequent nocturnal urination, decreased concentration, high blood pressure, morning headaches, jerking/leg twitching.  Tr. 461.  Osterland saw Dr. Hoy the next day with complaints of diarrhea/constipation.  Tr. 464-465.  Dr. Hoy noted that a sleep study had been ordered.  Tr. 465.  Dr. Hoy prescribed Jobst stockings (standard compression).  Tr. 464.  Other prescriptions included coumadin, vitamin K, Coreg, coumadin, and Lasix.  Tr. 465.  Dr. Hoy suggested a referral to an ENT to assess Osterland's intermittent hoarseness.  Tr. 465.  The ENT who Dr. Hoy wanted to refer Osterland to was scheduling in November but Osterland's insurance was scheduled to run out at the end of October.  Tr. 465.  Dr. Hoy noted that Osterland was going to check her insurance plan and call another ENT.  Tr. 465.

---

[3] Coreg "is used to treat high blood pressure and heart failure."  https://www.webmd.com/drugs/2/drug-1634/coreg-oral/details (last visited 5/21/2019).

On October 9, 2012, Osterland had a pulmonary function test performed in connection with a diagnosis of laryngitis. Tr. 469. The results of the test were indicative of moderate obstruction without clear evidence of a significant bronchodilator response. Tr. 369. The report indicated that Osterland did have evidence of fixed airways obstruction indicative of chronic obstructive pulmonary disease. Tr. 469. Additionally, the report indicated that the possibility of concomitant restrictions without measurement of static lung volumes could not be excluded. Tr. 469.

Osterland had a consult with Dr. Michael J. Rosen, M.D., FASC, at University Hospitals Case Medical Center regarding her umbilical hernia. Tr. 467-468. Dr. Rosen indicated that Osterland did have a small umbilical hernia but her CT scan showed no pathology to explain the left quadrant pain that Osterland complained about. Tr. 468. Dr. Rosen did not think her reported pain was related to her umbilicus. Tr. 468. Considering her weight, Dr. Rosen felt that surgical intervention was too high of a risk, especially in light of the umbilical hernia being asymptomatic. Tr. 468. Dr. Rosen offered Osterland weight loss strategies. Tr. 468.

Osterland's sleep study was performed on October 17, 2012, with a finding of mild obstructive sleep apnea. Tr. 478-482, 483-484. Osterland saw Dr. Hoy the next day for a check-up. Tr. 485-487. She was interested in discussing her umbilical hernia, noting she was not happy with Dr. Rosen's consult. Tr. 485. Osterland weighed 343.6 pounds. Tr. 485. Physical examination findings were normal. Tr. 485-486.

On November 13, 2012, Osterland had CPAP titration testing performed. Tr. 489. Testing showed that Osterland responded best to CPAP at a pressure setting of 11 cm of water. Tr. 489. During the testing, no significant evidence of periodic limb movement was seen and,

other than very mild bradycardia seen during REM sleep, there were no significant cardiac abnormalities observed. Tr. 489.

On June 14, 2013, Osterland was seen at the Fisher-Titus Medical Center emergency room (Tr. 493-507) for complaints of chest pain with intermittent tightness that was worse with exertion and that eased up with rest. Tr. 493. Osterland also reported shortness of breath and occasional dizziness. Tr. 493. An emergency room nurse noted that, after ambulating about 30 feet, Osterland complained, "it feels like my head is in a whirlwind and [I']m off balance." Tr. 493. However, it was noted that Osterland was ambulating without difficulty and returned to the cart and stated "a little chest pain but nothing like before[.]" Tr. 493. Osterland explained that she had vertigo secondary to her medication and, over the prior week, she had had waxing and waning episodes of dizziness. Tr. 493. She explained that her dizziness was exacerbated with movement and was associated with nausea. Tr. 493. Osterland described having the sensation that the room was spinning around her. Tr. 493. She had some episodic left-sided chest pain without radiation and some shortness of breath with exertion, a cough that produced yellow sputum, and some lower extremity edema. Tr. 493-494. The emergency room physician noted that Osterland had a long history of COPD but was not on home oxygen. Tr. 494. The emergency room physician noted that Osterland was resting comfortably and there was no conversational dyspnea. Tr. 494. It was observed that ambulating appeared to make Osterland's dizziness slightly worse but she was able to ambulate and was discharged. Tr. 498. Osterland's emergency room diagnoses were chest pain, vertigo and subtherapeutic INR. Tr. 498. Osterland was discharged home in stable condition with prescriptions and instructions to follow up with Dr. Hoy. Tr. 498.

**2.    Opinion evidence**

_Treating physician_

Treating physician Dr. Hoy provided a number of opinions regarding Osterland's medical conditions, which are summarized below.

### February 23, 2012, medical source statement

On February 23, 2012, Dr. Hoy completed a Medical Source Statement: Patient's Physical Capacity.  Tr. 405-406.  Due to back and leg pain and dyspnea, Dr. Hoy opined that Osterland was limited to carrying/lifting 5 pounds occasionally and frequently and her ability to stand/walk was limited to a total of 4 hours in an 8-hour workday.  Tr. 405.  Due to leg swelling, Dr. Hoy opined that Osterland's ability to sit was limited to a total of 4 hours in an 8-hour workday day and 1 hour without interruption.  Tr. 405.  Dr. Hoy opined that Osterland could rarely or never climb, balance, stoop, crouch, kneel or crawl; she could rarely or never push/pull or perform gross manipulation; and she could occasionally reach, handle, feel, and perform fine manipulation.  Tr. 405-406.  Dr.  Hoy opined that Osterland's ability to be around moving machinery, temperature extremes, chemicals, dust, and fumes was limited.  Tr. 406.  Dr. Hoy opined that, in addition to a morning, lunch, and afternoon break, Osterland would need to rest for some period of time during an 8-hour workday.  Tr. 406.  Osterland had not been prescribed a cane, walker, brace, TENS unit, or breathing machine.  Tr. 406.  Dr. Hoy opined that Osterland would need a sit/stand option and indicated that she experienced moderate pain.  Tr. 406.

### April 18, 2012, medical form

On April 18, 2012, Dr. Hoy completed a Basic Medical form for Ohio Job & Family Services.  Tr. 412-413.  Dr. Hoy indicated that Osterland's weight was 356 pounds and she had

the following medical conditions – back pain, pulmonary hypertension, and leg edema. Tr. 412. Dr. Hoy stated that Osterland had increased pain with activity; lymphedema limited her ability to stand; and her health was poor but stable. Tr. 412. Dr. Hoy opined that Osterland's impairment affected her ability to stand/walk, sit and lift/carry. Tr. 413. He opined that Osterland could stand/walk for a total of 2 hours in an 8-hour workday and stand/walk without interruption for 1 hour. Tr. 413. Osterland could sit for a total of 4 hours in an 8-hour workday and sit without interruption for 2 hours. Tr. 413. Osterland was limited to carrying/lifting 5 pounds occasionally and frequently. Tr. 413. Dr. Hoy opined further that Osterland was markedly limited in her ability to push/pull, bend, reach, and perform repetitive foot movements. Tr. 413. Osterland was moderately limited in her ability to handle and her vision was moderately limited. Tr. 413. Osterland was not significantly limited in her ability to hear or speak. Tr. 413. Dr. Hoy indicated that Osterland was not employable and Osterland's limitations were expected to last 12 months or more. Tr. 413.

*August 6, 2012, medical source statements*

On August 6, 2012, Dr. Hoy completed a Medical Source Statement: Patient's Physical Capacity.[4] Tr. 442-443. Dr. Hoy opined that Osterland was limited to carrying/lifting 10 pounds occasionally; her ability to stand/walk was limited to less than 1-hour total in an 8-hour workday and less than 1 hour without interruption; and her ability to sit was limited to a total of 2 hours in an 8-hour workday day and less than 1 hour without interruption. Tr. 405. Dr. Hoy opined that Osterland could rarely or never reach, handle, push/pull, perform fine manipulation, or perform gross manipulation. Tr. 443. Osterland could frequently feel. Tr. 443. Dr. Hoy opined that Osterland's ability to be around heights was limited. Tr. 443. Her impairments did not involve

---

[4] A portion of the postural limitation section appears to be cut off. *See* Tr. 442. Thus, while Dr. Hoy appears to have included postural limitations, the specifics of those limitations are not readable.

any additional environmental limitations.  Tr. 443.  Dr. Hoy opined that, in addition to a

morning, lunch, and afternoon break, Osterland would need to rest for some period of time

during an 8-hour workday.  Tr. 443.  Osterland had not been prescribed a cane, walker, brace,

TENS unit, or breathing machine.  Tr. 443.  Dr. Hoy opined that Osterland would need a

sit/stand option and indicated that she experienced severe pain.  Tr. 443.[5]

<u>May 8, 2013, evaluation form</u>

On May 8, 2013, Dr. Hoy completed a Physical/Emotional Evaluation.  Tr. 513.  Dr. Hoy

indicated that Osterland's current medications included Lasix, coumadin, and Coreg.  Tr. 513.

With respect to physical functional limitations, Dr. Hoy opined that Osterland had mild

limitations in her ability to balance and mild limitations in her ability to engage in prolonged

sitting.  Tr. 513.  He opined that Osterland had significant limitations in her ability to climb,

bend, reach/grasp, engage in prolonged standing, kneeling, and movement in the workplace.  Tr.

513.  Dr. Hoy checked both the "mild" and "significant" limitation boxes for ability to transmit

and receive information.  Tr. 513.  Dr. Hoy opined that Osterland's ability to lift was limited to 8

pounds.  Tr. 513.[6]

<u>Consultative examiner</u>

On February 15, 2012, consultative examining physician Sushil M. Sethi, M.D., MPH,

FACS, conducted an evaluation.  Tr. 375-381.  Osterland relayed having a history of bronchitis

---

[5] On August 6, 2012, Dr. Hoy also completed a Medical Source Statement: Patient's Mental Capacity.  Tr. 443-444.
In that statement, Dr. Hoy opined that Osterland's mental work-related abilities were either unlimited/very good or
good in all categories except she had a fair ability to complete a normal workday and work week without
interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable
number and length of rest periods and a poor ability to maintain regular attendance and be punctual within
customary tolerances.  Tr. 444.

[6] With respect to mental functional limitations, Dr. Hoy opined that Osterland had no limitation in problem solving
or cognition.  Tr. 513.  He opined that Osterland had mild limitations in memory, organizational skills, transmitting
and receiving information, performing activities of daily living independently, establishing and maintaining
relationships, and judgment.  Tr. 513.  Dr. Hoy opined that Osterland had significant limitations in sustained
concentration, adaptive skills, interpersonal interaction, and stress tolerance.  Tr. 513.

and some general chest pain.  Tr. 375.  Osterland indicated about a year prior her leg became

very heavy and swollen and she was treated at the hospital.  Tr. 375.  Treatment included

placement of a vena cava filter and she was continuing to take coumadin and have her blood

checked once a month.  Tr. 375.  She did not have brawny or peripheral edema[7] at the time of the

consultative evaluation and she was not wearing support hose.  Tr. 375.  Osterland relayed a

prior injury to her left knee and indicated that she felt she had arthritis for a long time.  Tr. 375.

Osterland indicated she had trouble walking for extended periods of time, squatting and

kneeling.  Tr. 375.  She was not limited in her activities of daily living and she denied weakness,

paralysis, numbness and loss of control of bladder or bowel.  Tr. 375.  Following his evaluation,

which included a physical examination and review of pulmonary function studies and spine and

left knee x-rays, Dr. Sethi's impression was: (1) history of chronic bronchitis, past history of

smoking, pulmonary function studies suggest mild restrictive pulmonary disease; (2) blood clot

one year prior with good results, no post-clot complications; and (3) history of mild arthritic

complaints in knee, normal x-rays.  Tr. 377.  Dr. Sethi further opined:

> Based on my objective findings, the claimant's ability to do work-related physical
> activities such as sitting, standing, walking, lifting, carrying and handling objects
> may be limited to medium labor.  She can sit 4-6 hours, walk 2-3 hours and stand
> 2-3 hours in an 8-hour shift.  She can carry 20-25 lb frequently and 30-50 lb
> occasionally.  Her hearing, speaking and traveling are normal.

Tr. 377.

   *State agency reviewers*

   On February 27, 2012, state agency reviewing physician Steve E. McKee, M.D.,

completed a Physical RFC Assessment.  Tr. 89-90.  He opined that Osterland could occasionally

---

[7] "The term *edema* refers to a discernible excess of interstitial fluid. *Pitting edema* gives way on palpation, leaving persistent impressions in the skin; *brawny edema* offers resistance and leaves no impressions."
https://www.ncbi.nlm.nih.gov/books/NBK348/ (last visited 5/21/2019) (emphasis in original).

lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds; she could stand and/or walk about 6 hours in an 8-hour workday; she could sit about 6 hours in an 8-hour workday; and she could push and/or pull unlimitedly, other than as shown for lift and/or carry. Tr. 90. Dr. McKee opined that Osterland would have the following postural limitations – she could occasionally climb ladders/ropes/scaffolds and frequently climb ramps/stairs and crawl. Tr. 90. Dr. McKee found no other limitations. Tr. 90. He further explained his RFC, stating, "[a]lthough [claimant] is obese, there are no significant functional problems. [Claimant] is able to walk, no use of aids. No breathing issues. PFS results were essentially normal. Imaging of knee and back were essentially normal as well." Tr. 90.

On July 16, 2012, upon reconsideration, state agency reviewing physician Frank Stroebel, M.D., completed a Physical RFC Assessment. Tr. 113-115. Dr. Stroebel's RFC assessment was similar to Dr. McKee's except Dr. Stroebel found that Osterland could never, rather than occasionally, climb ladders/ropes/scaffolds and also found that Osterland would have to avoid all exposure to heights. Tr. 114. Dr. Stroebel explained that he found that ladders were precluded due to Osterland's elevated BMI. Tr. 114.

## C.     Testimonial evidence

### 1.     Plaintiff

Osterland testified at and was represented at both the January 22, 2014, (Tr. 43-71), and the March 1, 2017, hearing (Tr. 551-573).

*January 22, 2014, hearing testimony*

Osterland was 54 years old at the time of the hearing. Tr. 49. Osterland has problems with her voice that make it difficult for her to speak. Tr. 64. She was having problems speaking during the hearing. Tr. 46-48, 65-66. Her doctors have explained that her respiratory problems

are causing her voice problem. Tr. 64. Because her lungs are at about 70% capacity, she tries to force air out and it is as if her vocal cords are straining to get her voice out. Tr. 64. About 3 or 4 days each week, Osterland has problems with her voice to the point where she cannot carry on a normal conversation. Tr. 64. Her voice problems were occurring more frequently and had gotten worse when she started to have blood clotting issues. Tr. 64.

Osterland has lived alone for over 10 years. Tr. 50. She weighed 340 pounds. Tr. 49. Osterland's medications include Symbicort, Lasix, and warfarin.[8] Tr. 56. Osterland has medication side-effects, including blurred vision, vertigo, loose bowel movements, and frequent urination. Tr. 56. Osterland's daughter drove her to the hearing. Tr. 50. Osterland was able to drive but had problems driving on trips due to medication side-effects that could cause her to have urinary or bowel accidents. Tr. 51. About a half year before Osterland stopped working at Walmart, which was in October 2010, Osterland started to notice swelling in her left foot. Tr. 56-57.

Osterland was hospitalized for a pulmonary embolism and, while she was hospitalized, she received a Greenfield filter placement. Tr. 57. After receiving the Greenfield filter placement, Osterland did not have any recurring problems with embolisms but she had recurrent DVT (deep vein thrombosis) and clotting problems in her left leg shortly after coming home from the hospital. Tr. 57. She had to be readmitted to the hospital and has been on coumadin treatments since that time. Tr. 57-58.

Osterland was able to perform daily activities, including cooking and housekeeping. Tr. 58. With some difficulty, she was able to bathe and get herself dressed. Tr. 58. She has to limit her showers to 10 minutes because she starts to get lightheaded and has trouble breathing. Tr.

---

[8] A common brand name for warfarin is coumadin. https://www.webmd.com/drugs/2/drug-3949/warfarin-oral/details (last visited 5/21/2019).

58-59.  Once she gets out of the shower, she has to sit on the toilet to get her breathing back in order and calm herself down.  Tr. 59.  She then is able to dry off and get herself dressed.  Tr. 59.  Osterland fixes something to eat and then sits in a chair in her living room to concentrate on her breathing.  Tr. 60.  When she is sitting in her living room, Osterland elevates her left leg on a stool because of the swelling in her foot and leg.  Tr. 60.

Osterland estimated being able to stand for about 10-30 minutes before she starts to have problems with her leg.  Tr. 60.  She then has to sit down, preferably with her leg propped up.  Tr. 60.  Osterland's leg swells every day.  Tr. 61.  Extended walking and standing make the swelling worse.  Tr. 61.  Osterland can sit down with her foot not elevated for about 30 minutes before she starts to have swelling that is uncomfortable.  Tr. 61.  She can walk no more than 30 minutes before she has to stop and take a break.  Tr. 62.  Osterland indicated that her doctor restricted her to lifting about five pounds.  Tr. 65.

With regard to her breathing, Osterland explained she has good days and bad days.  Tr. 62.  She described a good day as one in which her voice is what she would call normal, meaning she does not cough up phlegm and mucus for an hour and she can talk on the phone without any problems with her voice, and she is able to go outside and enjoy the fresh air without having breathing problems.  Tr. 62.  She described a bad day as one in which her foot swells so much that she is unable to get her shoe on; she coughs up phlegm and mucus for an hour; and she has to take more frequent stops when doing simple things like getting something to eat or doing the dishes to concentrate on her breathing.  Tr. 63.  If it is a really bad day, Osterland does not even wear a shirt because she struggles to breathe.  Tr. 63.  Osterland estimated that she has bad days about half of the month.  Tr. 63.  As far as her everyday routine, Osterland's breathing problems limit her more than her foot problems.  Tr. 63.

Osterland indicated that there were some treatments/procedures that her doctors have recommended but she has not done because of no insurance, including support hose to help with the swelling, a sleep apnea machine, and seeing a speech therapist to help with her voice. Tr. 63-64. She has followed her doctors' recommendations for a low-salt and law-fat diet. Tr. 64-65. Osterland has not lost weight but she has maintained her weight. Tr. 65. Because carrying things makes it difficult for Osterland to breathe, she uses an umbrella stroller to push things to her car. Tr. 65. It helps her with her breathing and balance. Tr. 65.

*March 1, 2017, hearing testimony*

Osterland indicated that she had been treating with Dr. Hoy since 2010 when she had her pulmonary embolism. Tr. 555. Osterland saw Dr. Hoy fairly regularly from 2010 through November 2013, except she did not see Dr. Hoy from April 2011 to around December 2011 because she was without insurance to cover her visits. Tr. 555-557. How often Osterland saw Dr. Hoy was dependent in part on what was going on with her medical conditions and what she needed at the time. Tr. 556. Dr. Hoy monitored her INR levels every month.[9] Tr. 556. Dr. Hoy ordered pulmonary function studies, concussion studies and prescribed medication for Osterland. Tr. 557.

## 2. Vocational expert

Vocational Expert Charles H. McBee ("VE") testified at the March 1, 2017, hearing.[10] Tr. 566-572, 808-810. The ALJ informed the VE that she found Osterland's past relevant work to be as a greeter, home health aide and general office clerk. Tr. 559.

---

[9] INR blood test results are used to determine the correct amount of blood thinner medication. *See* https://my.clevelandclinic.org/health/diagnostics/16791-blood-tests-for-those-taking-anticoagulants-blood-thinners (last visited 5/21/2019).

[10] Vocational Expert Joseph L. Thompson testified at the January 22, 2014, hearing. Tr. 67-71, 169-171.

For her first hypothetical, the ALJ asked the VE to assume an individual who could perform the functions of light work[11] except occasional climbing stairs; no climbing ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, crawling; occasional exposure to temperature extremes, humidity, and respiratory irritants; no exposure to obvious hazards; and occasional pushing or pulling on levers or controls with the lower extremities; can understand, carry out, and remember simple instructions where the pace of productivity is not dictated by an external source over which the individual has no control, such as an assembly line or conveyor belt; make judgments on simple work; can respond appropriately to usual work situations and changes in a routine work setting; and respond appropriately to supervision, the general public, and coworkers but only occasional need for actually speaking to others. Tr. 561. Considering the described individual, the VE indicated that the individual would be unable to perform Osterland's past relevant work but there would be other jobs that the individual could perform, including merchandise marker, office helper, and palletizer.[12] Tr. 561-562.

The ALJ then asked the VE to modify the sitting, standing and walking requirements in the first hypothetical to walking one hour in a workday and standing and/or sitting four of eight hours in each workday and asked whether the modification would change the VE's answer. Tr. 562. The VE explained that the modifications would reduce the hypothetical individual to sedentary work. Tr. 562. Therefore, the light jobs identified would not be available. Tr. 562. The VE explained that, with four hours of standing and one hour of walking, the individual could

---

[11] The regulations provide that light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). SSR 83-10 – *Determining Capability to do other Work* -- the Medical-Vocational Rules of Appendix 2, explains further that, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours out of an 8-hour workday." 1983 WL 31251, *5-6 (1983).

[12] The VE provided job incidence data for each of the identified jobs, noting that the number of jobs in 2010 would have been approximately 20% lower that the numbers provided, which were present day numbers. Tr. 562.

not meet the minimum of six hours (between standing and walking) out of the eight-hour workday required for light exertion work. Tr. 567, 570. With the hypothetical presented, there would only be five hours between the standing and walking. Tr. 570.

The ALJ then asked the VE to consider the first hypothetical with the additional limitation of needing tasks that could be performed in a seated or standing position. Tr. 562. The VE replied that the merchandise marker and office helper jobs previously identified would remain available but there would be a reduction in the number of merchandise marker jobs available. Tr. 563. The palletizer job would be eliminated but another job, photocopy machine operator, would be available. Tr. 563.

The VE explained that ordinary breaks during the course of a workday generally include two 15-minute breaks and a 30-minute lunch break based on an 8-hour workday. Tr. 563. The VE provided his opinion regarding the ordinary tolerance for absenteeism, on/off task requirements, and allowance for elevation of legs. Tr. 564. The VE indicated that, because an individual performing light work is generally standing, elevation of the leg is generally not accommodated or permissible at the light exertional level. Tr. 565. However, for the jobs that were identified that would allow for a sit-stand option, as long as the elevation was no greater than 8-12 inches, elevation would be acceptable. Tr. 565-566.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[13] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[14] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[13] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[14] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

20 C.F.R. §§ 404.1520, 416.920;[15] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her June 20, 2017, decision, the ALJ made the following findings:[16]

1.   Osterland meets the insured status requirements through December 31, 2015. Tr. 527.

2.   Osterland has not engaged in substantial gainful activity since December 1, 2010, the alleged onset date. Tr. 527.

3.   For the period of December 1, 2010, to November 16, 2013, Osterland had the following severe impairments: history of pulmonary edema, chronic obstructive pulmonary disease, obesity, and mild L5-S1 and left knee degenerative joint disease. Tr. 527. Osterland had the following non-severe impairments: umbilical hernia and mild obstructive sleep apnea. Tr. 527.

4.   Osterland did not have an impairment or combination of impairments that met or medically equaled the severity of a Listing. Tr. 527.

5.   For the period of December 1, 2010, through November 16, 2013, Osterland had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except: sit or stand six of eight hours and walk one of eight hours in a work day; occasional pushing or pulling levers or controls with the extremities; occasional climbing stairs; no climbing ladders and the like; occasional stooping greater than 90 degrees, kneeling, crouching or crawling; occasional exposure to temperature extremes, humidity and respiratory irritants; and no exposure to obvious hazards. Tr. 528-536. Osterland can also: understand, carry out and remember simple

---

[15] The DIB and SSI regulations cited herein are generally identical. Accordingly, in some instances herein, for convenience, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[16] The ALJ's findings are summarized.

instructions; perform work that is not fast paced, such as where the pace of productivity is not dictated by an external source over which the claimant has no control; appropriately respond to supervision, the general public, and coworkers, but only occasional need for actual speaking to others. Tr. 528-536.

6.     For the period of December 1, 2010, through November 16, 2013, Osterland was unable to perform any past relevant work. Tr. 536.

7.     Osterland was born in 1959 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. Tr. 536.

8.     Osterland has at least a high school education and is able to communicate in English. Tr. 536.

9.     Transferability of job skills is not material to the determination of disability. Tr. 537.

10.    For the period of December 1, 2010, through November 16, 2013, considering Osterland's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Osterland can perform, including merchandise marker, office helper and palletized. Tr. 536-537.

11.    Osterland has not been under a disability, as defined in the Social Security Act, from December 1, 2010, through November 16, 2013. Tr. 537-538.

### V. Plaintiff's Argument

Osterland argues that the ALJ did not properly apply the treating physician rule when assessing and weighing the opinions of her treating physician Dr. Hoy.

### VI. Law & Analysis

**A.     Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court may not overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not err in weighing the opinions of treating physician Dr. Hoy**

Osterland argues that the ALJ violated the treating physician rule when weighing opinions rendered by her treating physician Dr. Hoy.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*,

378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

After discussing the four medical opinions rendered by Dr. Hoy after the alleged onset date but prior to November 17, 2013,[17] (Tr. 532-533), the ALJ explained the weight she assigned to those opinions, stating:

> Dr. Hoy's above assessments are accorded partial weight as they are based on a treating relationship with the claimant and are generally (although not fully) internally consistent; however, his assessments are not fully supported by the objective medical evidence of record and are thus not able to be accorded greater weight. For example, as detailed above, Dr. Hoy assesses the claimant with a range of standing and walking limitations that limit the claimant from standing/walking up to two hours to less than one hour in an eight hour workday and include limiting the claimant to a range of lifting and carrying of only up to ten pounds. Dr. Hoy's range of findings could represent a worsening of symptoms overtime; however, the

---

[17] The ALJ noted that Dr. Hoy completed two other medical statements in 2017. Tr. 534. Considering the date of those later opinions, the ALJ found them not probative with regard to the period prior to November 17, 2013. Tr. 534. Osterland does not challenge this finding.

objective evidence is not fully supportive of Dr. Hoy's level of standing/walking and lifting carrying limitations. For example, at the consultative examination, the claimant was observed to have some reduced range of motion in her knees and lumbar spine, yet, she was also observed to have normal gait, normal ability to ambulate on her heels and toes, normal sensory and motor exams, and no evidence of muscle weakness or atrophy. (4F). Furthermore, objective studies of her lumbar spine showed evidence of only mild osteoarthritic changes at L5-S1 posteriorly and x-rays of her knees were negative. (4F). Additionally, on exam on July 24, 2012, at the hospital, the claimant was observed to have no back tenderness, normal range of motion of the spine, and the only positive finding was positive +1 pitting edema of the left foot. (9F/2). Moreover, although the claimant reported imbalance or weakness at an emergency room presentation in June 2013, emergency staff observed the claimant to have had no difficulty with ambulation. (23F/1).

Additionally, consistent with the claimant's mild findings on objective testing and limited findings on physical examination, the record supports the claimant did not participate in any ongoing treatment for musculoskeletal symptoms of any kind. It is noted that the claimant's respiratory impairments may also limit the claimant's ability to ambulate; however, the evidence on exam notes only mild to moderate respiratory findings, which were treated with outpatient monitoring and medication. (4F, 17F, 18F, and 20F). Nothing supports the claimant's respiratory impairments were significant enough to limit her ability to perform standing/walking to the degree assessed by Dr. Hoy. In addition, the undersigned has considered the claimant's left lower foot edema which was noted on exam (5F/1 and 9F/13); yet, this appears to have reduced with Lasix treatment and this was also treated by Dr. Hoy with compression stockings (9F/13 and 15F/13). Limited left foot swelling occurring intermittently during the adjudicated period, treated with conservative measures, does not support limiting the claimant to less than 2 hour of walking or standing in an eight hour day. For these reasons, Dr. Hoy's exertional limitations are accorded less weight. Likewise, the handling, feeling, fine and gross motor limitations assessed by Dr. Hoy are also accorded limited weight as these assessments are not consistent with any of the objective findings of record, which reveal generally normal grip strength and normal ability to perform fine and gross motor functions. (1F/43-50 and 4F). For these reasons, Dr. Hoy's assessments are accorded some overall general weight as they are based on his treatment history with the claimant and as they reflect the claimant does have limitations with regard to performing tasks; however, the specifics of his assessments are not well supported by the objective medical evidence or by claimant's overall conservative outpatient treatment history. Therefore, only partial weight is accorded to Dr. Hoy's assessments.

Tr. 533-534.

The Court's review is limited to whether the ALJ's decision is supported by substantial

evidence. It is not the role of this Court to "try the case *de novo*, nor resolve conflicts in

evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. The ALJ clearly explained her reasons for assigning partial weight to Dr. Hoy's opinions. Even if substantial evidence or indeed a preponderance of the evidence supports Osterland's position, this Court may not overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

While Osterland disagrees with the ALJ's weighing of the evidence, her arguments amount to a request that this Court consider the evidence *de novo*. For example, Osterland argues that Dr. Hoy's decision to prescribe compression stockings a month after a venous ultrasound was negative shows that Osterland was continuing to have problems with her legs. Doc. 13, p. 18. However, the ALJ acknowledged and discussed Osterland's leg problems. Tr. 529 (discussing pulmonary emboli and IVC filter that was surgically placed), Tr. 530 (discussing 1+ edema examination findings), Tr. 534 (discussing left foot edema). But, the ALJ found the problems to be intermittent and treated with conservation measures, i.e., Lasix and compression stockings. Tr. 534. Thus, he found Dr. Hoy's extreme standing/walking limitations not well supported by the evidence of record. Tr. 534. Osterland takes issue with the ALJ not noting that Osterland testified that she was unable to afford the compression stockings due to a lack of insurance. Doc. 13, pp. 18-19. However, "an ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) (*Loral Defense Systems–Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999)). And, even though Osterland testified to her inability to afford the compression stockings, Osterland has not shown that the record does not support the ALJ's finding that Dr. Hoy's recommended treatment for Osterland's leg problems was conservative.

Osterland contends that, when considered in combination, her obesity, moderate obstruction in breathing, ongoing pain and swelling in her left lower extremity provide strong support for Dr. Hoy's opinions. Doc. 13, p. 19. To the extent that Osterland is suggesting that the ALJ did not consider her obesity in combination with her other impairments, her claim is unsupported by the record. The ALJ clearly considered Osterland's obesity along with her other impairments. Tr. 531 ("The claimant's weight, including the impact on her ability to ambulate as well as her other body systems, has been considered within the functional limitations determined herein.").

Osterland also challenges the ALJ's findings relative to her respiratory impairments. Doc. 18, pp. 19-20. Again, Osterland's arguments amount to a request that the Court consider the evidence *de novo*. She contends that the pulmonary function studies show moderate restriction that was not correctable with medication. Doc. 13, pp. 19-20. The ALJ did not ignore the October 2012 pulmonary function study results showing moderate obstruction. Tr. 530. The ALJ discussed this evidence, noting that the results were indicative of and Osterland was assessed with COPD. Tr. 530. The ALJ then noted the limited treatment Osterland received for her COPD. Tr. 530. The ALJ did not play doctor in considering the pulmonary function studies or other evidence regarding Osterland's respiratory problems. The ALJ acknowledged that these problems may limit Osterland's ability to ambulate but, consistent with the regulations, weighed the evidence and, in doing so, found that the evidence did not support the degree of standing/walking limitations that Dr. Hoy opined Osterland would have.

Moreover, in reaching her decision to assign partial weight to Dr. Hoy's opinions, the ALJ considered other evidence, including objective diagnostic tests as well as objective examination findings and observations. Tr. 533-534. For example, the ALJ considered the

objective physical examination findings of the consultative examiner Dr. Sethi as well as an emergency room nurse's note from June 2013, indicating that Osterland was observed to have no difficulty ambulating even though Osterland relayed she was off balance.  Tr. 375-381, 493, 533.

Osterland has failed to show that the ALJ did not comply with the treating physician rule when weighing Dr. Hoy's opinions and the Court finds that the ALJ's assignment of partial weight to Dr. Hoy's opinions is supported by substantial evidence.   Thus, even if Osterland could show that substantial evidence or even a preponderance of the evidence supports her position, this Court may not overturn the Commissioner's decision since there is substantial evidence to support the ALJ's findings.  *Jones*, 336 F.3d at 477.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: May 21, 2019

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge